LAVINA LOZIER

*v.*

GABRIEL HILL and CORNELIUS B. HARVEY, executors of Catherine A. Talmage, deceased, et al.

[Filed October 31st, 1904.]

1. A contract to devise land is within the statute of frauds.

2. The statute of frauds is available as a defence to a suit for specific performance of a contract to devise, under an answer denying any promise to make the devise.

3. The conveyance of land for its full value is not part performance of the parol agreement of the grantee to devise it to the grantor, so as to take it out of the statute of frauds.

4. Parol evidence is not admissible to show that an absolute conveyance of land was made on an oral agreement of the grantee to devise it to the grantor.

5. Complainant, having conveyed land to her brother on his oral agreement to devise it to her, did not assert her claim or make it known until ten years after his death, and after the death of his wife, to whom he devised the land.—*Held*, that she is estopped by her laches and acquiescence from enforcing the agreement against the devise of her brother's wife.

On bill, answer and proofs.

The bill is filed to specifically enforce a parol contract to devise a parcel of land situate in the village of Closter, Bergen county, New Jersey. The complainant, on February 21st, 1875, conveyed by an ordinary warranty deed the land in question to her brother, John B. Kip, now deceased. The deed recites a consideration of $1,450, but the proofs seem to show that the actual consideration, so far as the same was money, was only $1,000, which was duly paid. The complainant claims that at the time of the conveyance, and as an inducement to her to make it, her brother, Mr. Kip, promised that he would erect a house on the lot and then devise the whole to her upon his decease, and that relying on this promise she made the convey-

ance and accepted the $1,000, although at the time she deemed the lot to be worth about $500 more. The complainant also appears to have desired to retain the lot for her own use.

Mr. Kip, soon after purchasing the lot, erected a house upon it at a cost of nearly $4,000, which he occupied as a residence. His family consisted of himself and his wife, alone, his only child having died some time before the date of the conveyance to him and of his alleged promise.

In 1882, Mr. Kip, who had some time before lost his wife, and whose relations with his sister (the complainant) had ceased to be cordial, married a widow, Mrs. Catherine A. Demarest, and continued occupying the said residence with this wife until his death, in 1891. Mr. Kip's will, which was executed in 1888, after making a gift to his brother, Isaac, apparently of comparatively little importance, left substantially his entire estate absolutely to his widow, who was also made the sole executrix.

In 1897 Mr. Kip's widow and devisee married a clergyman and became Mrs. Talmage. In 1901 Mrs. Talmage died, leaving a will which she had executed in 1891, a few months after Mr. Kip's death. The evidence indicated that upon Mr. Kip's death there was dissatisfaction among his nearest relatives, who were his brothers, and the complainant, his sister, with the provisions of his will, and there was even talk of contesting the same on the ground that at the time of its execution he (Mr. Kip) was of unsound mind. Mrs. Kip declared to these disappointed relatives, however, that she had promised her husband not to leave to her relatives the property which he devised and bequeathed to her, but to "keep it altogether and make it all right in the end." There was evidence that the Kip relatives, or some of them, at least, postponed their expectations until the death of Mrs. Talmage. No evidence was offered to show that Mrs. Talmage ever was informed of the promise alleged to have been made by Mr. Kip to the complainant in 1875. The will of Mrs. Talmage gave legacies to four brothers of Mr. Kip, but gave nothing to the complainant or to her children. Mrs. Talmage died January 19th, 1901. The bill of complaint in this cause was filed March 11th, 1901.

*Mr. David D. Ackerman,* for the complainant.

*Mr. Robert L. Lawrence* and *Mr. Cornelius B. Harvey,* for the defendants.

STEVENSON, V. C.

Without undertaking to discuss in detail all of the questions raised in this case, I shall endeavor to state the main points, the consideration of which has led me to the conclusion that the complainant's bill should be dismissed.

1. The proof of a legal contract, as distinguished from a mere declaration of a testamentary intention, is unsatisfactory. Leaving out of view, for the present, the mere form of the contract and the absence of any written evidence of it, the fact that a verbal contract was made as alleged in the bill of complaint certainly ought to be established with reasonable certainty.

The talk between the brother and sister, which is alleged to have constituted a legal contract, apparently contained, also, other very different elements involving a benefaction. Mr. Kip paid at least two-thirds the full value of the lot, according to the complainant's estimate. The house which he contemplated erecting was to be a home for himself. The house, in fact, cost nearly $4,000. Mr. Kip would hardly have regarded his statements as constituting only a legal contract when he was proposing to acquire merely a life estate in the land at a price which the evidence shows beyond all question was a very large price for such life estate, then to increase the value of the property fourfold by the addition of buildings, and, lastly, give the whole at his death to his sister, the complainant.

The witnesses to the conversation, or series of conversations, alleged to have resulted in the oral contract, give their testimony from memory twenty-seven years after such conversations occurred.

The only witnesses to the contract are the complainant and her two daughters. One of these daughters was thirteen years of age and the other fourteen and a half years of age when they heard the conversations which they now narrate. Their

recollection seems to have been refreshed after Mr. Kip's death, in 1891, which was sixteen years after the conversations occurred, by talking over with their mother "the wrong that had been done" to her by her brother, Mr. Kip, when he failed to make a devise to her in his will in accordance with his alleged promise.

When the conveyance was made to Mr. Kip, in 1875, he was in extremely feeble health, and the expectation of all parties concerned seemed to be that he would only live a short time. This fact makes it probable that Mr. Kip would entertain and express testamentary intentions in regard to his sister, the complainant.

That Mr. Kip in good faith contemplated devising to his sister the land in question, and so stated, may be fully conceded without finding that he ever made or intended to make a contract which bound him to do that thing, and consequently stripped him of all control over the disposition of the land which he bought and paid for, and the dwelling-house which he erected thereon.

In my opinion the testimony fairly shows that Mr. Kip paid a full price—all that the land was worth in 1875—but also indicates that the complainant, Mrs. Lozier, desired to keep the lot, not so much for the purpose of obtaining more money for it, as for actual use as a site for a new residence which she expected to build. The situation was one where the whole contract between the brother and sister might have been embraced in the sale of the lot for the sum of $1,000, while both parties may have recognized that the sister was doing the brother a favor in gratifying his wish to have this particular piece of ground for a home for the few remaining years that he expected to live. Mr. Kip might well have recognized the kindness of his sister in selling the lot even for full value, and might have expressed an intention to recognize the favor which he had received by a vastly greater favor which he proposed to confer by his will. There is a great deal about this testimony, and particularly the statements of the complainant herself, which suggests that her real grievance was not that her brother broke

a binding contract which he had made with her, but that she had not received any portion of his estate, either under his will or under the will of his widow, who survived him.

The conversation which related to the purchase of the lot for $1,000 bears every appearance of being a business transaction; the conversation in which it is alleged Mr. Kip agreed to devise the lot back to his sister, with a dwelling-house erected upon it, lacks many of the marks of a strict business transaction. While the parties contemplated that Mr. Kip would not live very long, the time of performance was wholly indefinite. Mr. Kip was obliged to build a house upon the lot which would go to his sister at his death, but what the character or value of the house was to be was in no way defined. It is evident that Mr. Kip might have carried out the alleged contract to the very letter in various ways, involving a difference in the value of the pecuniary result to his sister extending over a range of many thousands of dollars.

This is a case where the parties who were talking were very liable to mingle talk about business with talk about courtesies and favors. After many years it may be difficult for witnesses suffering from disappointed expectations to make accurate distinctions between these two very different kinds of talk. There were some significant indications in the testimony of the complainant and her witnesses that the alleged contract was quite distinct from the conveyance, and was not a mere matter of negotiation and agreement. The complainant herself, on cross-examination, testified in regard to her assent to the final proposition as follows:

"We talked it over some time. Brother Isaac [a brother who was present during the conversation] persuaded me to let him have it, as he was ill and needed a home, and we ought to humor him and let him have it: *so I did so.*"

The husband of the complainant, who attended to the business of drawing the deed, testified, on his direct examination on behalf of the complainant, to a conversation with Mr. Kip, in the course of the business, as follows:

"He [Mr. Kip] said he had offered my wife a thousand dollars, and he also said that he had told her that he would make it to her in his will when he died. He gave as an explanation that his health was poor and that there would be enough for his widow, if he left one, and that she had no idea of living in Closter anyhow after he was gone; that she would probably go back to her father, and as he was well to do there would probably be enough to take care of her, and therefore *he wanted to do something for Lavina*, and he told her he would leave the place to her when he died."

Two witnesses for the complainant testified that Mr. Kip stated to them that he had bought the lot and paid $1,000 for it.

This testimony of witnesses for the complainant seems hardly to support the theory that the proposed devise of the lot was a matter of definite contract obligation.

It may also be observed that within about four years after the alleged contract was made and the lot was conveyed to Mr. Kip the brother and sister became somewhat estranged, and their relations were not cordial during the period of about twelve years that ensued until the time of Mr. Kip's death. If, as the complainant represents in her bill, the bargain was not reduced to writing because of her confidential relations with her brother, it would have been natural, when those friendly relations were disturbed, for her to inquire as to her rights under the alleged verbal contract, and to ask her brother, as an honest man, to put in writing for her protection the bargain which he had made.

2. The alleged contract of Mr. Kip to devise the land in question to the complainant is within the statute of frauds. *Browne Fraud.* § 263; *Johnson* v. *Hubbell,* 10 *N. J. Eq.* (2 Stock.) 332; *Gould* v. *Mansfield,* 103 *Mass.* 408; *Harder* v. *Harder,* 2 *Sandf. Ch.* 17.

The answer does not set up the statute of frauds as a defence, but it denies that Mr. Kip ever made *any* promise to devise the land to the complainant. Upon such an answer the defendant has the full benefit of the statute of frauds as a defence. *Van Duyne* v. *Vreeland,* 12 *N. J. Eq.* (1 Beas.) 142; *Walker* v. *Hill's Executors,* 21 *N. J. Eq.* (6 C. E. Gr.) 191, 202, 203; S. C., 22 *N. J. Eq.* (7 C. E. Gr.) 513, 519 (*Court of Errors and Appeals*); *McKee* v. *Griggs,* 51 *N. J. Eq.* (6 Dick.) 178,

*184; Wakeman* v. *Dod, 27 N. J. Eq. (12 C. E. Gr.) 564, 565; Busick* v. *Van Ness, 44 N. J. Eq. (17 Stew.) 82, 84.* Whether a different rule would be applicable if the answer had merely denied the oral promise, without setting up the statute, need not be considered.

No facts are proved which exempt the alleged oral contract from the operation of the statute of frauds.

There was no fraud in the transaction. No fraud will be effectuated in case the promise to devise was made and the complainant fails to get the land by devise or by the decree of this court. In such case the complainant will not be defrauded, but will merely suffer from the non-performance of a promise which is not legally enforceable.

The only suggestion of fraud about the transaction in question is connected with the personal relations between the complainant and Mr. Kip, which it is alleged were relations of trust and confidence, of which he (Mr. Kip) took advantage. I think, however, that the evidence entirely fails to show that the transaction between these two people was in any way affected by any relations of confidence beyond those which generally exist between a brother and sister.

The bill, it is true, alleges that it was "the usual custom and practice" between this brother and sister

"in all their business transactions and dealings with each other * * * because of their perfect faith, confidence and trust in one another, neither to give nor take any memorandum thereof, and accordingly * * * no written memorandum of the terms of the said agreement was made."

The testimony to support this allegation seems to come from the complainant alone and is extremely meager. The complainant testified generally—"We never did anything without his advice; we were like one family." The following leading question was then put: "In your business transactions together, did you in any of those transactions reduce them to writing between yourselves?" and thereupon the complainant answered, "No, sir." The further question was then put: "How were you in the habit of carrying out your little agreements together?" to which the complainant answered, "We had perfect confidence in one another, and therefore we didn't need any paper."

Not the slightest effort was made to prove a single business transaction that ever took place between the brother and sister excepting the one under investigation in this cause. Nor was any evidence presented of any business affair of the complainant in which she sought or obtained her brother's advice.

The abuse of relations of trust and confidence often has the effect to alter or even dissolve the most solemn written contracts. Such conduct has been classified among frauds. The party who alleges that such a tort has been committed and thereupon asks to have a written contract set aside is bound to prove his charge, and at the very foundation of the charge lies the fact of the existence of the relations of trust and confidence which are alleged to have been abused. The disclosure which is made in the testimony in this cause of the relations of this brother and sister to each other before this contract was made, at the time it was made and during the years that followed until the brother's death, does not, in my judgment, indicate that when they bargained from day to day and finally concluded the conveyance of the lot in question, there were any relations of trust and confidence between them which the brother abused or had the power to abuse. The complainant was of mature age and had a husband who was an active business man to advise her, and who did in fact take part in this negotiation. Mr. Kip had formerly been engaged in business in New York City or Jersey City, and only for a few years had resided in Closter. The friendly association of the brother and sister seems to have covered a period of from four to six years before the conveyance, and about four years thereafter. Then there was a permanent rupture.

The account given by all the witnesses, including the complainant, indicates very strongly that the complainant, in making the particular bargain under investigation, was absolutely free from any influence from her brother, and asserted her views, which were hostile to his wishes, with independence and energy. She denied his repeated requests that she sell him the lot for the amount which he offered ($1,000), and it appears from the complainant's testimony, as well as from that of her daughters, that her brother practically accepted such denial as a finality. Mr. Kip then made his new offer, which included the devise

of the lot back to his sister after the house should be erected upon it. The complainant most distinctly testifies that this new offer was the inducement which persuaded her to make the conveyance to Mr. Kip. Assuming that the oral contract was made, the situation presented, in my opinion, is the ordinary one where a party competent to contract has voluntarily, with full knowledge of all the facts, and with the aid of independent advice, made a contract which is not enforceable on account of the provisions of the statute of frauds. . If the mere relation of brother and sister, with the ordinary incidents of friendship which usually accompany that relation, are sufficient in this case to convert an absolute deed practically into a conveyance of a mere life estate, and bind the grantee, who has paid full value, to add several thousand dollars in value to the property before it is to revert to the grantor, then it seems to me a long step is taken towards removing all contracts between brothers and sisters, or other near relatives, or even intimate friends, from the protection of the statute of frauds.

The only *performance* of the contract on the part of the complainant consisted in her conveying the land for the sum of $1,000, which she received. She stands in no better position than if she had paid $500 in cash as the consideration of a promise made by her brother to her to erect a house on a lot belonging to him, and then to devise the house and lot to her at his death.

Payment in whole or in part of the consideration does not exclude the operation of the statute. *Browne Fraud.* § *461 et seq.; Pom. Spec. Perf.* § *106; Brown* v. *Brown, 33 N. J. Eq. (6 Stew.) 650, 660; Lippincott* v. *Bridgewater, 55 N. J. Eq. (10 Dick.) 208, 210; Cochrane* v. *McEntee, 51 Atl. Rep. 279.*

The conveyance of the lot to Mr. Kip was not an act which in the slightest degree suggests the alleged parol contract to devise it back to the complainant. On the contrary, this conveyance is a distinct transaction which seems to be a natural and proper one for the parties to make, and does not call for the alleged parol contract, or collateral contract, for its explanation. The alleged parol contract in fact contradicts the complete written contract which the parties made.

If the land had been conveyed for no consideration, or for a

plainly inadequate consideration, then the alleged parol contract would have explained a transaction which otherwise would appear to have been an extraordinary one, involving an unreasonable and improvident gift.

There is not a single act shown to have been performed by either party to the alleged parol contract which is not referable to the written contract, or which can be attributed to the parol contract except by calling in parol evidence to contradict the written contract. Of course, I leave out of view the claim that the land was sold for an inadequate price, because I have found that such claim is entirely unsupported by the proofs. The further claim that the land was sold for a less price than complainant would have been willing to accept is of no importance, because the complainant's state of mind on that subject is evinced by parol evidence only.

Professor Pomeroy, in dealing with the essential character of such acts in part performance of a parol contract as remove it from the operation of the statute of frauds, and the proper mode of proof of such acts, states the law as follows:

"A plaintiff cannot, in the face of the statute, prove a verbal contract by parol evidence and then show that it has been partly performed. This course of proceeding would be a virtual repeal of the statute. He must first prove acts done by himself or on his behalf which point unmistakably to a contract between himself and the defendant which cannot, in the ordinary course of human conduct, be accounted for in any other manner than as having been done in pursuance of a contract, and which would not have been done without an existing contract; and although these acts of part performance cannot *of themselves* indicate all the terms of the agreement sought to be enforced, they must be consistent with it, and in conformity with its provisions when these shall have been shown by the subsequent parol evidence. It follows, from this invariable rule, that acts which do not unmistakably point to a contract existing between the parties, or which can be reasonably accounted for in some other manner than as having been done in pursuance of such a contract, do not constitute a part performance sufficient in any case to take it out of the operation of the statute, even though a verbal agreement has actually been made between the parties. It is for this reason, among others, that payment of the purchase price, in whole or in part, is not of itself a sufficient performance to obviate the statute, because the mere payment of money by one man to another does not, in the ordinary course of human conduct, indicate the existence of a contract between them; the fact of such payment is reasonably explicable in many other ways than as having been done in pursuance of a contract." *Pom. Spec. Perf. § 108.*

If the conveyance by the complainant to Mr. Kip was such part performance as takes the alleged verbal promise out of the operation of the statute, I see no reason why any one of ten thousand grantors of land may not get his land back by a lease, a conveyance in fee or a decree by simply proving by parol that he sold his land at a smaller price than he otherwise would have accepted upon the verbal promise of the grantee to lease, convey or devise it back. That all conveyances of land after the decease of the grantee are subject to such a possible defeasance, is certainly a very startling suggestion.

The conclusion on this branch of the case is that the statute of frauds is a complete defence to the whole case made out by the complainant, assuming that the parties intended to make, and did make, so far as possible by mere words, the contract set forth in the bill of complaint.

3. Precisely the same result is reached if we exclude the statute of frauds from consideration and apply the well-settled rules which protect written contracts from impeachment by parol testimony. The effect of giving force to this alleged oral contract would be to alter radically a most solemn contract in writing—a conveyance of land under seal—and to convert what on its face is an absolute conveyance of the whole legal and equitable estate into a conveyance of a life estate only, leaving an equitable estate in reversion vested in the grantor.

As has already been pointed out in discussing the relation of the statute of frauds to the case, no actual or constructive fraud or other sufficient reason has been shown which would justify any court in dealing in such a violent manner with this plain written contract. No exception on behalf of the complainant is established which takes her case out of the operation of the wholesome general rule excluding parol testimony when offered to alter the meaning of a complete, intelligible, written contract.

In connection with this point it is well to consider the appalling results which might follow if this grantor, who made this conveyance of land in fee, after sleeping on her rights upon a plea of poverty or mistake of law until her grantee and her grantee's devisee have both died, should be allowed by parol testimony to inject into the written contract a contemporaneous oral

agreement, and thereby establish in herself a full reversionary ownership.

4. The laches and acquiescence of the complainant, in which there is also an element of estoppel, in my opinion, are fatal to her claim to the equitable relief of specific performance.

Assuming that there was an enforceable contract, the contract was broken in 1891, when Mr. Kip died without devising the house and lot to the complainant. The complainant then became the equitable owner of the land, while the legal title passed under Mr. Kip's will to his widow, who afterwards remarried and became Mrs. Talmage. The complainant not only made no effort to enforce her rights, but gave Mrs. Talmage no notice of their existence. There is no evidence that Mrs. Talmage ever in any way received the slightest notice of the alleged promise which Mr. Kip had made in 1875, or the claims of the complainant based thereon. The evidence indicates strongly that the complainant intentionally concealed her claim from Mrs. Talmage and resolved to keep it concealed permanently during Mrs. Talmage's lifetime, with the hope or expectation, not that in some mysterious way Mrs. Talmage would discover the complainant's alleged equitable or moral claim in respect of this particular piece of land, and upon her death devise the land to her or to her children, but that she or her children would come in for a share of the voluntary distribution of the Kip estate which Mrs. Talmage declared her purpose to make at her death among the members of the Kip family. The evidence indicates that the complainant may have justly supposed that the announcement of her claim to Mrs. Talmage would mar this expectation.

The complainant's concealment of her claim, in fact, lasted for ten years. Mrs. Talmage died in 1901. Mr. Kip's brother Isaac, who was present when the conversation took place in 1875, in which the promise is alleged to have been made, died in 1892. Mrs. Talmage, although probably not able to give any important testimony herself in defence of her estate, may have had information, derived from her deceased husband or otherwise, which would aid such defence, but which now is unavailable. The fair presumption in this case is that the delay of the

complainant in asserting her claim was continued until by a change of conditions the defence against it may have become more difficult.

But the conduct of the complainant amounts to more than mere laches. She stood by in silence for ten years, knowing that Mrs. Talmage thought that she was the equitable as well as the legal owner of the property in question, and also knowing that it was Mrs. Talmage's purpose to discharge certain moral or social obligations of her deceased husband by a disposition of some part at least of what had been his estate by her will. The complainant in effect acquiesced in such disposition of this property as Mrs. Talmage in the exercise of her discretion might see fit to make.

There are quite distinct indications that the complainant perceived that it would not be to her advantage to assert even the strong moral claim which she thought she had to this particular part of the Kip estate if she was to stand as a candidate for a benefaction out of the Kip estate through Mrs. Talmage's voluntary action. It was possible that Mrs. Talmage might have devised to the complainant some other house and lot. If so, the complainant's position in this suit would have been exceedingly inequitable. The same result, practically, would have followed if Mrs. Talmage had given the complainant a substantial legacy. In fact, Mrs. Talmage, by her will, distributed portions of the Kip estate among Mr. Kip's relatives, but gave the complainant nothing. Considering strictly what Mrs. Talmage did, and disregarding what she might have done, it certainly is beyond dispute that she disposed by her will of this particular piece of property in ignorance of the complainant's claim, while the complainant stood by in silence and allowed her so to dispose of it. It is at this point that the element of estoppel comes in. The silence of the complainant misled Mrs. Talmage. Mrs. Talmage was injured because she disposed of the Kip estate by her will under the false supposition, if the complainant's contention is correct, that this particular piece of land, worth about $4,000 or $5,000, was a part of that estate. The residuary legatee is injured to precisely that extent. What is left for this beneficiary, if anything, does not appear.

If Mrs. Talmage had been notified of even the moral claim of the complainant she might have made any one of a number of appropriate provisions for the removal or satisfaction of such claim. Her benefaction to the residuary legatee, which is greatly impaired, if not defeated, might have been protected by a different adjustment of her other legacies.

Without undertaking to pass upon the effect of the complainant's conduct upon any legal rights which she may have, I think that such conduct constitutes a bar to the equitable remedy of specific performance. *2 Pom. Eq. § 817; Pom. Spec. Perf. § 408.*

The excuses which have been offered for the conduct of the complainant in sleeping on her alleged rights and concealing her claim may be briefly disposed of. The excuse of poverty is not proved. The indications from the evidence are that no such excuse in fact existed. It may be observed that within two months after Mrs. Talmage's death this present suit was commenced. But the most fatal default which the complainant made during Mrs. Talmage's lifetime did not consist in her failure to commence an expensive suit in equity for the enforcement of her rights, but in her failure to notify Mrs. Talmage of the existence of those rights, or rather of the existence of the promise of Mr. Kip, out of which the whole moral as well as equitable claim of the complainant had arisen.

The poverty of the complainant, if such condition in fact existed, did not prevent her from notifying Mrs. Talmage of her strong moral claim. Poverty would only add force to her appeal.

The excuse that the complainant supposed during Mrs. Talmage's lifetime that her case could not be prosecuted successfully in any court owing to the lack of written evidence, which supposition we now assume to have been unwarranted, is manifestly inadequate. Whatever views the complainant entertained on this subject, and it does not appear that she ever made the slightest effort to obtain the opinion of counsel in regard to it, such views did not prevent her from giving notice of her claim.

The last excuse which need be noticed is that Mrs. Lozier waited in the expectation that Mrs. Talmage would by her will devise the house and lot in discharge of Mr. Kip's obligation.

Without discussing at length the legal sufficiency of such an excuse, it is sufficient to point out that Mrs. Lozier had no reason to suppose that Mrs. Talmage knew of the obligation above mentioned, and therefore had no right to expect that she would undertake by her will to acknowledge and discharge it. The theory that the declaration made by Mrs. Talmage immediately upon the reading of Mr. Kip's will included the satisfaction of any such claim as that of the complainant is entirely untenable. Mrs. Talmage's statement was, in effect, that she had promised Mr. Kip not to leave to her relatives the property which he had devised and bequeathed to her, but "to keep it all together and make it all right in the end." The things which Mrs. Talmage declared her purpose to "make all right" related plainly to the natural expectations of Mr. Kip's immediate relatives, which had met with disappointment in his will. Mrs. Talmage, in fact, as we have seen, undertook to make many of these things right by the legacies to Mr. Kip's brothers contained in her will. The wrong to Mrs. Lozier was done in 1891, when Mr. Kip died. That wrong was not merely a disappointment of an expectation arising from the fact that Mrs. Lozier regarded herself as one of the natural objects of her brother's bounty, but a violation of a property right which, in the complainant's mind, whatever view she may have entertained as to her ability to obtain redress by legal proceedings, must have been sharply distinguished from a mere disappointment in respect of a legacy. The declaration of testamentary intention made by Mrs. Talmage could only be made to apply to the complainant's claim by showing that Mrs. Talmage had notice of that claim. The mere declaration itself does not suggest that Mrs. Talmage had notice of this claim, so as to make any notice of it from the complainant unnecessary.

When Mrs. Talmage (at that time Mrs. Kip) took possession of the house and lot as her absolute property under her husband's will, the complainant was nearly fifty years old, while she (Mrs. Talmage) was sixteen years younger, and in good health. When asked what she expected would be the result in case she died before Mrs. Talmage, an event which certainly would be in accordance with existing probabilities, she could only reply that she expected that Mrs. Talmage would leave the house and lot to

her (the complainant's) children. And yet the complainant did not consider it worth while either to notify Mrs. Talmage of Mr. Kip's promise, or even to ascertain that she already knew of that promise. Mrs. Talmage was married to Mr. Kip in 1882, a considerable time after the relations between the complainant and Mr. Kip had become in a measure unfriendly. The only possible support for a supposition in the mind of the complainant that Mrs. Talmage had learned of this ancient verbal promise made by Mr. Kip to his sister in 1875, so far as is disclosed by any evidence in this case, must be found in a mere surmise that Mr. Kip may have voluntarily informed his wife in regard to the matter. The complainant was not warranted in entertaining such a supposition, the correctness of which she could have tested at any time.